HALPERN MAY YBARRA GELBERG LLP
  Marc D. Halpern (CA Bar No. 216426)
600 West Broadway, Suite 1060
San Diego, California 92101
Telephone: (619) 618-7000
marc.halpern@halpernmay.com

HALPERN MAY YBARRA GELBERG LLP
  Leslie A. Pereira (CA Bar No. 180222)
  Thomas Rubinsky (CA Bar No. 302002)
500 S. Hope Street, Suite 2330
Los Angeles, California 90071
Telephone: (213) 402-1911
leslie.pereira@halpernmay.com
thomas.rubinsky@halpernmay.com

Attorneys for Plaintiff
Live Nation Entertainment, Inc.

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIVE NATION ENTERTAINMENT, INC., | CASE NO. 2:21-CV-00862 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1) **DECLARATORY RELIEF** |
| FACTORY MUTUAL INSURANCE COMPANY, | 2) **BREACH OF CONTRACT** |
| Defendant. | **JURY TRIAL DEMANDED** |

COMPLAINT

## **INTRODUCTION**

1.     This insurance coverage action concerns the wrongful failure by Factory Mutual Insurance Company ("FM"), as Live Nation Entertainment, Inc.'s ("Live Nation") insurer, to acknowledge coverage and pay amounts owed to Live Nation for property damage and business interruption losses suffered because of the communicable disease COVID-19.

2.     As the world's largest live entertainment company, Live Nation sells experiences that involve bringing large numbers of people together to enjoy live music events.  Live Nation events take place in the more than 250 venues that Live Nation owns and operates throughout the world, as well as in numerous other third-party venues that Live Nation rents or leases for its events.

3.     Beginning in March 2020, and continuing to the present, the widespread existence and appearance of COVID-19 among Live Nation's employees, fans, customers, suppliers, and in the community at large, and also the resulting presence and impact of COVID-19 at and around these venues, caused direct or imminent physical loss or damage to Live Nation's properties — and triggered an unprecedented and nearly complete shut-down of the live music industry.

4.     Fortunately for Live Nation, it had previously secured, at significant expense, the premier version of an "All Risk" property insurance policy issued by FM — the so-called "FM Global Advantage® Policy."  This policy specifically designates communicable disease as a covered cause of loss, and provides various coverages and extensions with significant policy limits for the many categories of losses that may result from communicable disease and its impacts.

5.     While the policy limits are insufficient to cover all of Live Nation's losses in the extreme pandemic that has burdened much of the world these last ten months, with the FM Global Advantage® Policy Live Nation purchased substantial financial protection against this exact situation.  That is, the scenario where a

COMPLAINT

covered peril has caused a catastrophe with widespread impact on Live Nation's venues and other properties, as well as properties immediately adjacent to its venues, and throughout the Live Nation community of employees, artists, fans, customers, and suppliers, resulting in massive losses.

6.      Thus, Live Nation reasonably believed that FM would owe coverage for these losses, and expected that FM would expeditiously acknowledge those obligations and promptly start issuing payments to Live Nation during its time of need.

7.      Live Nation timely submitted its coverage claim to FM, and followed with a detailed proof of loss.  However, FM has thus far failed to acknowledge or provide any coverage.  Furthermore, on information and belief, FM institutionally has decided to narrowly interpret or altogether deny coverage for COVID-19 claims under its FM Global Advantage® policies.

8.      Accordingly, Live Nation is filing this action to establish and enforce its full rights to coverage from FM for the submitted losses.

## **THE PARTIES**

9.      Plaintiff Live Nation Entertainment, Inc. is a Delaware corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.

10.      On information and belief, Defendant Factory Mutual Insurance Company is a corporation incorporated under the laws of the State of Rhode Island with its principal place of business in Johnston, Rhode Island.  At all times relevant to this Complaint, FM was authorized to transact and did, in fact, transact the business of insurance in Los Angeles County, in the State of California.

COMPLAINT

**JURISICTION AND VENUE**

11.     This Complaint has an independent basis of jurisdiction due to the complete diversity of the parties, and because the amount in controversy set forth in this Complaint exceeds $75,000, exclusive of costs.  <u>See</u> 28 U.S.C. § 1332.

12.     Venue is proper in this District under 28 U.S.C. §1391 because jurisdiction is based only upon diversity of citizenship, and a substantial part of the events giving rise to this claim occurred in this District.

**GENERAL ALEGATIONS**

**I.     Live Nation's Business**

13.     Live Nation is the largest live entertainment company in the world. Its business model depends almost entirely on bringing large groups of people together for live music events.  Most of Live Nation's revenue is generated through promotion of live music tours, the operation of venues that host concerts, sales of sponsorship and advertising for such venues or show activity, and ticketing of concerts and sporting events.

14.     Live Nation owns and operates over 100 indoor theaters and clubs throughout the United States, including the House of Blues chain of live music halls with restaurants.  <u>See</u> Exhibit 1.  Live Nation also owns or operates over 50 outdoor amphitheaters.  <u>See</u> Exhibit 2.  In 2019, Live Nation put on more than 40,000 shows and 100 festivals and sold around 100 million separate tickets to such live events.

15.     More Live Nation properties are located in California than in any other state.  <u>See</u> Exhibits 1 and 2.  Live Nation owns and/or operates approximately 25 clubs and theaters throughout California, and at least seven amphitheaters.  <u>Id</u>.  In addition, Live Nation's headquarters and the headquarters for its largest subsidiary, Ticketmaster, are located in Southern California.

## II.     The COVID-19 Pandemic and Ensuing Closure Orders

16.     COVID-19 is a deadly communicable disease caused by a recently discovered virus known as SARS-CoV-2.

17.     In early 2020, COVID-19 began its spread throughout the world. Observing the difficulty of containing this new disease, on January 31, 2020 the World Health Organization (WHO) declared a health emergency.  The United States followed suit on February 3, 2020.  By March 2020, the COVID-19 outbreak was a global pandemic.

18.     Where COVID-19 goes, so does SARS-CoV-2, as it is released and deposited by infected individuals into and onto their surroundings.

19.     According to the Center for Disease Control (CDC), COVID-19 "is primarily transmitted from person-to-person through respiratory droplets. These droplets are released when someone with COVID-19 sneezes, coughs, or talks. Infectious droplets can land in the mouths or noses of people who are nearby or possibly inhaled into the lungs."

20.     The CDC also has noted that "[r]espiratory droplets can land on hands, objects or surfaces around the [infected] person when they cough or talk, and people can then become infected with COVID-19 from touching hands, objects or surfaces with droplets and then touching their eyes, nose, or mouth."  In addition, scientists have determined that there can be transmission of COVID-19 through droplets of those with mild symptoms or those who do not feel ill.

21.     As of December 31, 2020, more than 19,663,976 people in the United States have had the COVID-19 disease, resulting in more than 341,199 deaths.  See https://covid.cdc.gov/covid-data-tracker/#cases_totalcases.  By several metrics, California has been the hardest hit of any state.  As of the end of 2020, California has had more than 2,218,142 confirmed cases of COVID-19, and the disease is believed to be widely prevalent in the population.  Id.

COMPLAINT

22.     Because of the nature and ease of the transmission of COVID-19, social distancing and the avoidance of large groups of people has become one of the primary means of preventing the spread of the disease.

23.     Beginning in March 2020, in response to the pandemic and the worldwide spread of COVID-19, state governments and other civil authorities throughout the United States began issuing "stay at home" and "shelter in place" quarantine orders and requiring the suspension of non-essential business operations, including the live entertainment venues owned and operated by Live Nation (collectively, "Closure Orders").

24.     Taking California and specifically Los Angeles County as an example, the following relevant orders were issued at the outset of the pandemic:

- Taking effect on March 12, 2020, Governor Gavin Newsom issued Executive Order N-25-20, ordering that: "All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19."
- On March 15, 2020, Los Angeles Mayor Eric Garcetti issued a public order prohibiting all dining in restaurants, prohibiting other large gatherings, and strongly discouraging religious gatherings.
- On March 16, 2020, the County of Los Angeles Department of Public Health issued an order prohibiting gatherings of over 50 people.
- On March 19, 2020, the State of California issued an Order of the State Public Health Officer, which required all individuals living in the state to stay at home or at their place of residence "except as needed to maintain continuity of operations of the federal critical infrastructure sectors."  The same day, Governor Newsom issued Executive Order N-33-20, expressly requiring California residents to follow the March 19, 2020 Order of the State Public Health Officer.

COMPLAINT

- On March 19, 2020, the County of Los Angeles amended its prior order and mandated the closure of all businesses operating in the County, subject to certain exceptions for "essential" businesses and business activities.  The County of Los Angeles stated that this order was in direct response to the "continued rapid spread of COVID-19 and the need to protect the most vulnerable members of our community."  It added that the order was "based upon scientific evidence and best practices, as currently known and available, to protect members of the public from avoidable risk of serious illness and death resulting from the spread of COVID-19 …."

- Also on March 19, 2020, Mayor Garcetti issued a Public Order Under City of Los Angeles Emergency Authority with the subject "Safer at Home." Mayor Garcetti's Order stated that "all persons living within the City of Los Angeles are hereby ordered to remain in their homes" and "all businesses within the City of Los Angeles are ordered to cease operations that require in-person attendance by workers at a workplace …."  Mayor Garcetti's Order included certain exceptions for "essential" businesses and business activities.

- On March 21, 2020, the County of Los Angeles Department of Public Health amended and superseded its March 16 and 19, 2020 Orders to "comply with Executive Order N-33-20 issued by Governor Gavin Newsom."  This March 21 Order "specifically requires all businesses to cease in-person operations and close to the public, unless the business is defined as an Essential Business by this Order."

- On April 1, 2020, Mayor Garcetti further revised his March 19, 2020 Order, reiterating that all Los Angeles residents were required to stay home and mandating the continued closure of non-essential in-person businesses.  The Order also explicitly recognized that the disease can spread easily from

person to person and that it "is physically causing property loss or damage ...."

25.    States, municipalities, and other civil authorities issued similar orders across the United States, including the states where Live Nation owns and operates live entertainment venues.

26.    In relevant part, the Closure Orders all required citizens to stay at home, restricted and/or prohibited travel, required social distancing, prohibited large gatherings, and/or mandated the continued closure or significantly reduced operation of all non-essential in-person businesses.  Those Closure Orders directly or effectively prohibited gatherings of people at entertainment venues like those owned and operated by Live Nation.

27.    While many of the Closure Orders were amended at various times between April and December of 2020, in most states Closure Orders severely impacting Live Nation's venues and operations still remain in effect.

**III.    Live Nation's Losses As a Result of the Pandemic**

28.    Beginning in March 2020, Live Nation began receiving reports of suspected and confirmed cases of COVID-19 at its domestic properties.  At the same time, COVID-19 was spreading rapidly throughout the communities surrounding its properties and the country as a whole, thereby creating a credible threat that Live Nation's insured locations could or would become a disease vector for COVID-19.

29.    Because of the spread of COVID-19 and also because of the Closure Orders all of Live Nation's United States properties were forced to close.  While some venues were permitted to reopen for restricted activity at various times in 2020, the vast majority of Live Nation's properties remain entirely closed as of December 31, 2020.

COMPLAINT

30.     By the end of the third quarter of 2020, Live Nation had cancelled more than 5,000 concerts impacted by the stoppage of events starting in mid-March, equating to approximately 15 million tickets.  In addition, Live Nation had nearly 6,000 shows postponed into 2021, equating to another approximately 22 million tickets.

31.     It is unknown at this time how many of those postponed shows will be cancelled or further postponed.  Likewise, most of the postponed shows took the place of other shows, by the same artists and/or at the same venues, that ordinarily would have been scheduled for 2021.

32.     As result, Live Nation suffered substantial lost revenue from ticket sales and other lost or dramatically diminished income streams associated with its properties and shows.  At the same time, Live Nation continued to incur very substantial expenses associated with those properties and shows.

33.     Ticket refunds, including both the amounts refunded and the significant efforts and expenses to effect the refunds, represent a substantial and necessary extra expense to Live Nation that was incurred in an effort to continue the regular conduct of its business.

34.     In addition, Live Nation has incurred, and will continue to incur, extra expenses in working with medical experts and public health officials to implement safety precautions and protocols necessary to allow employees to return to work in Live Nation's offices, and to allow artists and fans to return to live events at its venues.

35.     Live Nation has or will be forced to incur additional out-of-the-ordinary costs due to COVID-19, including for testing, protective equipment, reconfiguration of work and venue spaces for social distancing, and facilitation of remote work.

36.     These are some of the main examples of relevant losses, and Live Nation has suffered many other related losses which may also be covered.

COMPLAINT

37.     In short, COVID-19 has had a dramatic impact on Live Nation's properties and business, causing severe and unanticipated losses that Live Nation seeks to recover under its applicable FM insurance.

**IV.     The Premier FM Global Advantage® Policy**

38.     Live Nation purchased FM Global Advantage® Policy No. 1053350 from FM, with a policy period from at least June 1, 2019 to June 1, 2020 (the "Policy").[1]

39.     At all relevant times, the required premiums were paid for the Policy and the Policy was in full force and effect.

40.     Due to the nature of Live Nation's live entertainment business, Live Nation purchased one of the broadest available coverage forms to protect its venues and operations:  the FM Global Advantage® Policy.

41.     The Policy's "Property Damage" section states that it "covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded" (the "Property Damage Coverage").  This is what is known as an "All-Risk" property insurance policy—that is, a policy that is meant to protect the insured against all risks of loss, whether known or unknown, except only for those risks plainly, clearly, conspicuously and expressly excluded.

42.     By design, an All-Risks policy is intended to be broader and provide more coverage than an "enumerated perils" property insurance policy which only provides coverage for certain, specified causes of loss.  In effect, and as intended, an "All-Risk" property insurance policy places the risk of loss for unprecedented and unanticipated losses squarely on the insurance company.

---

[1] The Policy is incorporated herein by reference, due to its volume.  FM has a copy of the Policy, and a copy can be provided to the Court upon request.  With this Complaint, Live Nation seeks coverage under the Policy and under any other applicable FM insurance coverage issued to Live Nation.

COMPLAINT

43.     The FM Global Advantage® Policy is a premier form of property coverage.  The form not only provides "All-Risk" property and business interruption coverage, but it also includes a variety of even further expansive "policy enhancements" which were added by FM to its FM Global Advantage® Policy form in 2016.[2]   According to FM's website, these enhancements are intended to protect "against loss of income following a disaster, wherever you operate, or however indirect your connection to the loss."

44.     Disease is a risk that often may not fall within coverage under a standard All-Risk policy, because of the requirement for physical loss or damage (described further below) and also because of exclusions pertaining to pathogens, viruses or other disease-causing agents.

45.     However, in the case of the FM Global Advantage® Policy, one of the "policy enhancements" was to expressly include "Communicable Disease" as a covered cause of loss, thereby removing the obstacles that might otherwise exist to coverage.

46.     Communicable Disease is a risk understood to be potentially devastating in the live entertainment business.

47.     "Communicable Disease" is defined in the Policy, in relevant part, as: "disease which is transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges."

48.     FM has acknowledged that COVID-19 is a "Communicable Disease," as defined by the Policy.

49.     Likewise, there is no exclusion in the Policy for COVID-19.

---

[2] See https://www.fmglobal.com/products-and-services/products/the-fm-global-advantage-all-risk-policy.

COMPLAINT

**V.      Under The Policy, The Presence And Impacts Of A Communicable Disease Like COVID-19 Are Considered "Physical Loss or Damage"**

50.      Several of the relevant coverage grants in the Policy are triggered by physical loss or damage to specified property: either Live Nation's property or certain other specified property, such as the property of others in Live Nation's supply chain or the property of third parties within a designated radius of Live Nation's insured locations.

51.      The Policy does not define the terms "physical loss or damage," but common usage and legal interpretations have established that the terms "loss" and "damage" have separate and distinct meanings, with "loss" tending to include loss of use, loss of functionality for intended purpose, and loss of value, and the term "damage" tending to require some form of physical alteration.  Thus, taken together, "physical loss or damage" reasonably encompasses a basis for many or all of the losses Live Nation has sustained.

52.      Importantly, under the terms of the FM Global Advantage® Policy, the presence of Communicable Disease and its impacts are covered physical loss or damage.

53.      For example, the Policy's Property Damage Coverage includes, in addition to, and not in lieu of, other coverages in the Policy, a coverage grant entitled "Communicable Disease Response."  In relevant part, and in accordance with that coverage's express terms, to the extent Live Nation's properties are impacted by "the actual not suspected presence of communicable disease," FM is obligated to pay for the "cleanup, removal and disposal of … communicable disease from insured property."

54.      Thus, this provision, along with others in the Policy, explicitly recognizes that for purposes of determining coverage under this Policy, a Communicable Disease such as COVID-19 is considered to cause a physical, tangible alteration to the property wherever it occurs.

COMPLAINT

**VI.** **COVID-19 Has Caused and Continues to Cause Physical Loss or Damage to Live Nation's Property and Other Relevant Properties**

    **A.** **Presence Of Communicable Disease Within Insured Locations**

55. The presence of individuals with COVID-19 at a Live Nation property constitutes the presence of Communicable Disease, and thus covered physical loss or damage.

56. However, in the case of COVID-19, the physical impact of the Communicable Disease also extends beyond the presence of infected individuals. The disease is contagious by a number of pathways that persist without the presence of an infected person. A cloud of droplets of saliva or nasal discharge of an infected person, which may be released by a cough, a sneeze, or loud speech, can linger in the air for a period of minutes to hours, and can be pulled into air circulation systems. Thus, the property is rendered unusable, uninhabitable, and/or unfit for its normal occupancy.

57. COVID-19 can also spread through surface-to-person transmission after an infected person has touched a surface, or released their discharges onto a surface, and infectious droplets can remain on various objects and surfaces for a period of hours to numerous days. Some of the details regarding the duration and means of surface transmission have yet to be fully determined. Thus, there also is the physical alteration of the property that renders that property unsafe or unusable.

58. In short, under the Policy, where someone with COVID-19 is on-site, or has been on-site, at a location, the presence of Communicable Disease causes physical loss or damage to that property.

59. Live Nation currently is aware of more than 62 employees testing positive for COVID-19 at approximately 35 of its insured locations in the United States, nearly all in the spring or summer of 2020.

60. Of course, there were many other people who had COVID-19 at the insured locations during the relevant time periods. The CDC estimates that

infection rates for COVID-19 likely are at least ten times higher than reported, meaning that COVID-19 is widespread, particularly in California where the largest number of Live Nation's properties are located.

61.     Even without symptoms, infected individuals can be contagious, and disease transmission can occur.  Thus, COVID-19 can be on-site at an insured location even if the infected person is not showing symptoms of infection.

62.     Given the prevalence of COVID-19 and the fact that it can be completely asymptomatic, it is a near certainty that other employees, as well as customers or others visiting Live Nation's insured locations tested positive for COVID-19 or had an unconfirmed case of COVID-19 while visiting the insured location, unbeknownst to Live Nation.

B.     **Communicable Disease In The Vicinity And Surrounding Communities, Impacting The Insured Locations**

63.     The triggering of coverage by the Communicable Disease cause of loss goes beyond the on-site presence and alterations described above.

64.     Under the terms of the Policy, the presence of COVID-19 within Live Nation's insured locations is not required in order to trigger coverage.  If there is a loss of a property's functionality for its intended purpose due to the outside presence of Communicable Disease, that is sufficient.

65.     For example, the presence of people who have or had COVID-19 near the insured locations and in the surrounding communities, caused an impact to the properties which also constitutes covered "physical loss or damage" under the Policy.

66.     And, just like within the insured locations, the remaining presence of infected droplets in the air or on surfaces in the vicinity of the insured locations, such that it impacted the insured locations, caused covered "physical loss or damage."

COMPLAINT

67.     As described above, there were numerous individuals within the vicinity of the properties or the communities impacting the properties that have had COVID-19 during the relevant time periods.  COVID-19 reached pandemic status within nearly all of those areas, with some of the highest incident rates within the entire country in the areas around some of the insured locations.

C.     **Other Resulting Impairments**

68.     The presence of COVID-19 and resulting damage to property at or within five miles of Live Nation's insured locations led to enactment of Closure Orders which prevented access to and restricted the use of Live Nation's insured locations, and thereby also directly caused Live Nation to incur "physical loss or damage" to covered properties.

69.     COVID-19 and the Closure Orders issued as a result thereof impaired the "value, usefulness, or normal function of" Live Nation's premises, rendering them unfit for their normal business operations until such time as the relevant government agencies determine it is safe to reopen.

70.     Unless and until the relevant governmental agencies determine it is safe to reopen, Live Nation cannot resume its normal operations because, in light of the factors alleged above, there is a near certainty that COVID-19 will spread into such locations.

71.     Live Nation's loss of use of its property or damage to its property due to COVID-19 is "physical" because Live Nation has been deprived of the use and function of its buildings, land on which the buildings are located, and the immovable objects within these buildings.  Also, the Communicable Disease itself, and its contagious discharges, are considered physical within the context of this enhanced Policy.

72.     For all the aforementioned reasons, among others, Live Nation has incurred covered losses as a direct result of physical loss or damage of the type insured under the FM Global Advantage® Policy.

## VII.   <u>Additional Applicable Coverages</u>

73.    In addition to the Policy's broad "All-Risks" Property Damage Coverage, the Policy has a separate section for "Time Element" coverage.  In general, "time element" coverage is a form of coverage for loss resulting from the inability to put property to its normal use, and typically includes coverage for lost earnings/profits and the insured's extra expense to continue its business during the period of loss, as Live Nation's coverage does here.

74.    Live Nation purchased FM's premier "Time Element Select™" option which, according to FM provides "unmatched coverage."[3]  As marketed by FM, "No one can predict the future, and with our business interruption insurance coverage, you don't have to."

75.    Per the terms of the Time Element Select™ coverage: "This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES directly resulting from physical loss or damage of the type insured."

76.    Thus, the Policy's expansive insuring agreement provides broad protection against all time element loss resulting from Communicable Disease, as it is a covered cause of loss under the enhanced Policy.

77.     In addition, the Policy's Time Element Select™ coverage also provides several "Time Element Coverage Extensions" including, among others, various extensions applicable to Live Nation's "supply chain," meaning losses incurred outside of and/or away from Live Nation's covered locations but which impact Live Nation directly.  Some of the applicable Time Element coverages and extensions are listed below.

---

[3] <u>See</u> https://www.fmglobal.com/products-and-services/products/business-interruption-coverage.

COMPLAINT

**A.    Civil or Military Authority Coverage**

78.    One of those coverages is entitled "Civil or Military Authority."  That coverage provides:

> "This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometres of it."

79.    Here, the Civil or Military Authority Coverage is triggered because, among other things, Live Nation has incurred and continues to incur time element losses due to numerous Closure Orders that prohibit or restrict access to Live Nation's insured locations.

80.    These Closure Orders were issued, in whole or in part, as a result of physical damage to property at or within five miles of Live Nation's insured locations.  For example, Los Angeles Mayor Eric Garcetti issued an order on April 1, 2020, reiterating that all Los Angeles residents were required to stay home, mandating the continued closure of non-essential in-person businesses, and recognizing that COVID-19 "is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time."

**B.    Ingress/Egress Coverage**

81.    Another of the Policy's so-called supply chain coverages is entitled "Ingress/Egress."  That coverage provides:

> "This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured location, whether or not the premises or property of the

COMPLAINT

Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured."

82.    Here, the Policy's Ingress/Egress Coverage is triggered because Live Nation has incurred, and continues to incur, time element loss due to the necessary interruption of Live Nation's business because access in and out of many Live Nation locations is physically prevented, either partially or totally, as a direct result of the aforementioned physical loss or damage from COVID-19.

### C.    Contingent Time Element Extended Coverage

83.    The Policy also includes "Contingent Time Element Extended" coverage, which provides: "This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at contingent time element locations …."

84.    For its part, the term "contingent time element locations" is defined to mean "any location" of a "direct customer, supplier, contract manufacturer or contract service provider to the Insured" or of "a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider" of one of Live Nation's direct customers, suppliers, contract manufacturers or contract service providers.

85.    The Contingent Time Element Extended coverage is triggered because Live Nation has incurred, and continues to incur, time element loss directly resulting from physical loss or damage from COVID-19 to property of the type insured at the premises of Live Nation's: (1) direct customers, suppliers, contract manufacturers or contract service providers; or (2) other companies that are direct or indirect customers, suppliers, contract manufacturers or contract service providers of Live Nation's direct customers, suppliers, contract manufacturers or contract service providers.

COMPLAINT

**D.     Expediting Costs**

86.     The Policy also includes coverage for the costs Live Nation incurs to repair or replace damaged property.  That coverage states:

M. EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1) for the temporary repair of insured physical damage to insured property;

2) for the temporary replacement of insured equipment suffering insured physical damage; and

3) to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

87.     The Expediting Costs coverage is triggered because Live Nation has incurred, and continues to incur, costs associated with the repair of its insured locations.

**E.     Extra Expense**

88.     In addition, the Policy provides Live Nation with substantial coverage for all amounts incurred as "extra expense" to continue its business during the period of interruption (the "Extra Expense Coverage").  It states, in relevant part, the following:

D. EXTRA EXPENSE

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1)     extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business;

COMPLAINT

2)    extra costs of temporarily using property or facilities of the Insured or others; and

3)    costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

89.    The Extra Expense Coverage is triggered because Live Nation has incurred, and continues to incur, substantial additional out-of-the-ordinary costs as previously alleged, in order to continue its business as nearly normal as practicable.

**F.**    **Interruption by Communicable Disease**

90.    Another relevant coverage extension is "Interruption by Communicable Disease."  In relevant part, that coverage states that "[i]f a location owned, leased or rented by [Live Nation] has the actual not suspected presence of communicable disease and access to such location is limited, restricted or prohibited by" a governmental order or decision by a Live Nation officer, "this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured."

91.    Thus, to the extent Live Nation must close one of its own properties due to the actual presence of a communicable disease, its losses are covered.

92.    Here, as alleged above, there have been at least 62 confirmed cases of COVID-19 at approximately 35 of Live Nation's insured locations within the United States, principally due to employees testing positive in the spring or summer of 2020.  Accordingly, this coverage is triggered and must provide coverage in connection with certain of the losses at the insured locations with such actual cases of COVID-19.

COMPLAINT

93.    Additional coverages may also be triggered, and Live Nation is seeking the maximum coverage available from FM.  Likewise, as more facts develop and the COVID-19 pandemic continues to impact Live Nation, additional types of loss may be incurred that trigger other provisions.

94.    There are no exclusions that bar coverage for the Communicable Disease losses for which Live Nation is seeking coverage.  Rather, as indicated, the Policy expressly provides that Communicable Disease is a covered cause of loss, and that the impacts of Communicable Disease trigger numerous applicable coverages and coverage extensions.

95.    While Live Nation is aware that FM has raised its Policy's so-called "Contamination Exclusion" as a bar to coverage for COVID-19-related losses in connection with claims by other policyholders, that cannot be correct for many reasons, including, but not limited to, the following:

(a)    The Policy expressly designates communicable disease as a covered cause of loss and therefore the use of the term "virus" in that exclusion cannot refer to communicable disease;

(b)    The exclusion contains a dispositive exception providing that coverage is available if "the actual not suspected presence of contaminant(s) directly results from other physical damage not excluded by this Policy," which under the enhanced Policy would include any contamination resulting from COVID-19; and

(c)    By its express terms, the exclusion does not apply to losses caused by Closure Orders and other measures responding to the threatened presence of contamination, as opposed to the presence of actual contamination.

**VIII.  The Coverage Claim**

96.    By May 2020, Live Nation had timely provided notice of its coverage claim for the losses referenced in this Complaint.  (Taken together with all

subsequent notices and requests for coverage, referred to herein as the "Coverage Claim.")

97.     Live Nation has complied with all conditions and covenants to be performed by it under the Policy in order to obtain the coverage sought.

98.     Following further communications, in November 2020 Live Nation timely provided FM with a Proof of Loss for these losses.

99.     In December 2020, FM acknowledged receipt of the Proof of Loss and indicated that it was investigating the Coverage Claim.

100.    In January 2021, Live Nation followed-up with FM and provided additional information that had been requested by FM.

101.    To date, FM has failed to acknowledge coverage for the Coverage Claim or to pay any of the coverage it owes to Live Nation.

102.    Rather, on information and belief, FM has institutionally taken the position that it will deny nearly all coverage sought by its policyholders for COVID-19 losses, and will also similarly seek to limit or deny coverage for Live Nation's Coverage Claim.

103.    FM has been sued by many policyholders who have sought and been denied coverage for their COVID-19 Communicable Disease-related losses under the same or similar policy forms.  FM has responded to those lawsuits with further denials of coverage, some of which include statements on coverage that indicate FM has no intention to provide coverage for the Coverage Claim.

104.    Likewise, on information and belief, FM has instructed its adjusters handling COVID-19 coverage claims to follow certain "talking points" designed to steer policyholders away from coverage and then deny claims on a wholesale basis.

105.    These actions and intentions are both contrary to the coverage provided to Live Nation under the Policy for the Coverage Claim, but also are contrary to applicable government mandates requiring the acknowledgement and payment of proper COVID-19 insurance claims.

COMPLAINT

106.   For instance, on April 14, 2020, California Insurance Commissioner Ricardo Lara issued a notice, titled "Requirement to Accept, Forward, Acknowledge, and Fairly Investigate All Business Interruption Insurance Claims Caused by the COVID-19 Pandemic."

107.   By this action, Live Nation now seeks to confirm and enforce its coverage rights against FM for the Coverage Claim.

## FIRST CAUSE OF ACTION

### (Declaratory Relief – All Coverage Obligations)

108.   Live Nation incorporates the allegations of Paragraphs 1 through 107 of this Complaint, as though fully set forth herein.

109.   There presently exists an actual justiciable controversy between Live Nation, on the one hand, and FM, on the other hand, concerning FM's coverage obligations with respect to the Coverage Claim.

110.   The controversy includes the existence of coverage, scope of coverage, and quantum of coverage owed for the Coverage Claim.

111.   The controversy between Live Nation and FM is ripe for judicial review.

112.   Accordingly, Live Nation seeks a declaration confirming:

(a)   The Policy provides coverage for the Coverage Claim;

(b)   The Coverage Claim triggered the coverage provisions in the Policy, including all those identified herein;

(c)   No exclusion in the Policy bars or limits coverage for the Coverage Claim;

(d)   The quantum of covered loss owed by FM to Live Nation; and providing any other declaratory relief that would be useful to the resolution of the disputes between the parties.

COMPLAINT

## SECOND CAUSE OF ACTION

### (Breach of Contract)

113.   Live Nation incorporates the allegations of Paragraphs 1 through 112 of this Complaint, as though fully set forth herein.

114.   The Policy is a valid and enforceable contract between Live Nation and FM.

115.   Live Nation sustained covered loss under the terms of the Policy.

116.   The Coverage Claim was timely submitted to FM.

117.   Live Nation has performed each and every material obligation imposed upon it by the Policy in order to obtain coverage for the Coverage Claim, except to the extent such performance was either prevented or excused by FM.

118.   All other applicable conditions or pre-requisites under the Policy to FM being obligated to acknowledge or provide coverage for the Coverage Claim have been satisfied.

119.   Nonetheless, to date, FM has failed to acknowledge or provide any coverage to Live Nation for the Coverage Claim.  Rather, on information and belief, FM will refuse coverage.

120.   As a direct and proximate result of these failures, Live Nation has suffered, and continues to suffer, damages, principally comprised of the coverage owed by FM up to the Policy's applicable limits of liability.

## PRAYER FOR RELIEF

**WHEREFORE,** Live Nation prays for judgment as follows:

**On The First Cause of Action:**

1.     For a judicial declaration and order that:

(a)     The Policy provides coverage for the Coverage Claim;

(b)     Each of the coverage provisions identified herein, including any extensions and other applicable coverage provisions, have been triggered and provide coverage for the Coverage Claim;

COMPLAINT

(c)     No exclusion in the Policy bars or limits coverage for the Coverage Claim;

(d)     FM owes the full limits of coverage available under the Policy for each of the triggered coverage provisions, including any extensions;

2.     Any other declaratory relief that would be useful to the resolution of the disputes between the parties.

**On The Second Cause of Action:**

1.     For a declaration and order that FM has breached its obligations to Live Nation with respect to the Coverage Claim;

2.     For compensatory damages in an amount to be proven at trial.

**On All Causes of Action:**

1.     For costs of suit;

2.     For pre-judgment and post-judgment interest at the maximum legal rate on all sums awarded; and

3.     For such other and further relief as the Court may deem just and proper.

Dated:  January 29, 2021                    HALPERN MAY YBARRA GELBERG LLP
                                            Marc D. Halpern
                                            Leslie A. Pereira
                                            Thomas Rubinsky


                                            By:  _s/ Marc D. Halpern_____
                                               Marc D. Halpern
                                            Attorneys for Plaintiff
                                            Live Nation Entertainment, Inc.

COMPLAINT

24

## **JURY TRIAL DEMAND**

Plaintiff Live Nation Entertainment, Inc. demands a trial by jury.

Dated:  January 29, 2021                    HALPERN MAY YBARRA GELBERG LLP
                                                              Marc D. Halpern
                                                              Leslie A. Pereira
                                                              Thomas Rubinsky


                                                      By:   s/ Marc D. Halpern
                                                                Marc D. Halpern
                                                      Attorneys for Plaintiff
                                                      Live Nation Entertainment, Inc.

COMPLAINT