1  **HALPERN MAY YBARRA GELBERG LLP**
2    Marc D. Halpern (CA Bar No. 216426)
   600 West Broadway, Suite 1060
3  San Diego, California 92101
   Telephone: (619) 618-7000
4  marc.halpern@halpernmay.com

5    Leslie A. Pereira (CA Bar No. 180222)
6    Thomas Rubinsky (CA Bar No. 302002)
   550 South Hope Street, Suite 2330
7  Los Angeles, California 90071
   leslie.pereira@halpernmay.com
8  thomas.rubinsky@halpernmay.com
9
10 Attorneys for Plaintiff Live Nation
   Entertainment, Inc.
11
12
13            **UNITED STATES DISTRICT COURT**
14       **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

15 | LIVE NATION ENTERTAINMENT, | Case No. 2:21-cv-00862-JAK-KS
16 | INC., |
   | | **PLAINTIFF LIVE NATION**
17 |              Plaintiff, | **ENTERTAINMENT'S**
   | | **MEMORANDUM OF POINTS AND**
18 |       v. | **AUTHORITIES IN OPPOSITION**
19 | | **TO DEFENDANT FM INSURANCE**
   | FACTORY MUTUAL INSURANCE | **COMPANY'S MOTION FOR**
20 | COMPANY and DOES 1-30, | **JUDGMENT ON THE PLEADINGS**
21 | inclusive, |
   | | [Filed concurrently herewith:
22 |        Defendants**.** | Plaintiff's Request for Judicial Notice]
23 |
24 | | Hearing Date: September 13, 2021
   | | Time:          8:30 a.m.
25 | | Courtroom:     10B
26
27
28

# **TABLE OF CONTENTS**

I.     Introduction ................................................................................................. 1

II.    Statement Of Facts ..................................................................................... 2

    A.     Live Nation's Business ...................................................................... 2

    B.     The Covid-19 Pandemic and Its Impact on Live Nation ..................... 3

    C.     Live Nation's Purchase of FM's Global Advantage®
        Policy................................................................................................ 4

    D.     Live Nation's Coverage Claim ........................................................... 6

III.   Argument .................................................................................................... 7

    A.     Principles of Insurance Contract Interpretation ................................... 7

    B.     FM's Policy Recognizes Communicable Disease As a
        Covered Peril That Causes Physical Damage ...................................... 8

        1.     *The Terms of the FM Global Advantage® Policy*
             *Demonstrate that Communicable Disease is a*
             *Covered Peril that Causes Physical Damage* ......................... 9

        2.     *FM Told Insurance Regulators that It Intended*
             *Communicable Disease to be Covered as Physical*
             *Damage* ............................................................................... 13

        3.     *Case Law Holding that Covid-19 Does Not Cause*
             *Physical Damage Under Different Policies,*
             *Providing Different Coverage, is Irrelevant* .......................... 16

        4.     *FM is Wrong to Suggest that its Communicable*
             *Disease Coverage is Freestanding and Isolated*
             *From the Rest of the Policy, or Subject to an*
             *Aggregate Sublimit* ............................................................. 18

    C.     No Exclusions Bar Coverage for Live Nation's
        Communicable Disease Losses......................................................... 21

          D.     Live Nation's Losses Were Caused by Communicable
                 Disease ...................................................................................................24

IV.   Conclusion....................................................................................................25

1

# <u>TABLE OF AUTHORITIES</u>

2

**FEDERAL CASES**

3

*Boxed Foods Co., LLC v. California Cap. Ins. Co.*, 2020 WL 6271021

4
    (N.D. Cal. Oct. 26, 2020) ................................................................... 15

5

*Choctaw Nation of Oklahoma v. Lexington Ins. Co.*, 2021 WL 714032

6
    (D. Okla. Jan. 27, 2021) ................................................................... 19

7

*Cinemark Holdings, Inc. v. Factory Mutual Ins. Co.*, Case No. 4:21-

8
    cv-00011 (E.D. Tex. May 5, 2021) ................................................... 1

9

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010)......................... 16

10

*Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL

11
    168422 (N.D. Ohio Jan. 19, 2021) ............................................. 17, 24

12

*Hewlett-Packard Co. v. Factory Mut. Ins. Co.*, 2007 WL 98399

13
    (S.D.N.Y. Mar. 30, 2007)................................................................... 18

14

*Jackson v. CEVA Logistics*, 2020 WL 6743915 (N.D. Cal. Nov. 17,

15
    2020)................................................................................................... 16

16

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ..................................... 16

17

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 805 F. Supp. 2d

18
    945 (C.D. Cal. 2011) ................................................................. 18, 20

19

*Out W. Rest. Grp. Inc. v. Affiliated FM Ins. Co.*, 2021 WL 1056627

20
    (N.D. Cal. Mar. 19, 2021) ................................................................. 17

21

*S. Dental Birmingham LLC v. Cincinnati Ins. Co.*, 2021 WL 1217327

22
    (N.D. Ala. Mar. 19, 2021) ................................................................. 11

23

*Thor Equities, LLC v. Factory Mut. Ins. Co.*, 2021 WL 1226983

24
    (S.D.N.Y. Mar. 31, 2021).......................................................... 6, 21, 23

25

**STATE CASES**

26

*E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465 (Cal. 2004) ....... 7, 12, 13, 20

27

*MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635 (2003). 7, 9, 12, 13, 15, 16, 21, 22

28

*Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33 (1968) ............................................................... 15

*Palacin v. Allstate Ins. Co.*, 119 Cal. App. 4th 855 (2004) .................................... 15

*Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758 (2001) ............................................ 23

*Strubble v. United Servs. Auto. Assn.*, 35 Cal. App. 3d 498 (1973) ........................ 8

*The Villa Los Alamos Homeowners Assn. v. State Farm Gen. Ins. Co.*, 198 Cal. App. 4th 522 (2011) ........................................................ 7, 9, 13, 22

*Travelers Cas. & Sur. Co. v. Superior Court*, 63 Cal. App. 4th 1440 (1998) ................................................................................................... 8

*Vardanyan v. AMCO Ins. Co.*, 243 Cal. App. 4th 779 (2015) ............................ 8, 9

*Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1 (1995) ..................................... 7

*White v. Western Title Ins. Co.*, 40 Cal. 3d 870 (1985) .......................................... 7

**FEDERAL RULES**
Fed. R. Civ. P. 15(a)(2) ........................................................................................ 16

**STATE RULES**
Cal. Civ. Code § 1639 ............................................................................................ 7

## I.    **INTRODUCTION**

Defendant Factory Mutual Insurance Company ("FM") finds itself in an uncomfortable position relative to most insurance companies when it comes to covering Covid-19 losses—because FM (like almost no other property insurer) issued policies *expressly* covering communicable disease.  Now, faced with a massive coverage liability, FM tries to hide behind the rulings many courts have entered precluding Covid-19 claims under less generous policies.  As seen by the ruling entered just last week in *Cinemark Holdings, Inc. v. Factory Mutual Insurance Company*, Case No. 4:21-cv-00011, U.S. District Court, E.D. Texas, where the Court rejected a very similar motion by FM, for these policies it is a very different story.  As aptly noted by that Court, the FM coverage "is much broader" and "expressly covers loss and damage caused by 'communicable disease'".

The losses to U.S. businesses from the Covid-19 pandemic are extraordinary.  Even those businesses with significant insurance have often been left unprotected.  In a boon to the insurance industry, most courts have held that, unless a property policy provides otherwise, a communicable disease like Covid-19 does not fit the standard property policy requirement for physical loss or damage.  In other words, unless a policy indicates that communicable disease is a covered peril, it does not fall within coverage, even under an all-perils policy.  Indeed, that is the vast majority of such policies.  Moreover, many property insurance policies also contain a so-called "virus exclusion," in a standard form developed by the Insurance Services Office (ISO) after the first SARS outbreak, underscoring that virus-based communicable diseases coverage was not intended.

The FM Global Advantage® policy sold to Live Nation, however, is different.  It expressly includes "communicable disease" as a covered peril, and classifies the presence of communicable disease as physical loss or damage for purposes of the policy.  Not only does the policy reflect this by providing the "communicable disease" coverage extension—but *FM itself* told its regulators that

under this coverage communicable disease constituted physical damage.  And although FM's motion repeatedly cites to caselaw interpreting the impact of the ISO's virus exclusion on Covid-19 claims, FM's policy does not contain the ISO's virus exclusion.  Instead, the FM policy contains a very different "contamination" exclusion that does not apply, *by its own terms*, where the presence of virus results from a covered cause—in this case, the communicable disease Covid-19.

FM now attempts to rewrite the policy it sold to Live Nation to be more similar to the majority of property insurance policies that don't provide Covid-19 coverage, hoping that it can convince the Court that all the Court needs to do is join a growing consensus of courts around the country summarily dismissing insurance claims based on the Covid-19 pandemic.  But the question here is not *whether* Live Nation is entitled to coverage for its Covid-19 losses—as FM concedes that Live Nation is entitled to communicable disease coverage under the policy—but *how much coverage* Live Nation is entitled.  FM's effort to avoid the language of the policy it drafted by pointing to decisions interpreting policies without communicable disease coverage should be rejected, particularly where those cases involve insureds that did not even allege the presence of communicable disease at insured locations.

Examination of the actual policy FM sold to Live Nation using California law's principles for policy interpretation demonstrates that Live Nation has plausibly alleged covered "physical loss or damage" under the terms of the FM policy, and that FM has not met its burden to prove that Live Nation's allegations fall within coverage exclusions.  Accordingly, FM's Motion for Judgment on the Pleadings respectfully should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   Live Nation's Business

Plaintiff Live Nation Entertainment, Inc. ("Live Nation") is the world's largest live entertainment company, operating more than 100 theatres and clubs

1   and more than 50 amphitheaters in the United States.  (Compl. ¶¶ 13–14 [ECF No.
2   1].)  Its business depends almost entirely on bringing large groups of people
3   together for live music events.  (*Id.* ¶ 13.)  Most of Live Nation's revenue is
4   generated through promotion of live music tours, operation of venues that host
5   concerts, sales of sponsorship and advertising for venues and shows, and ticketing
6   of concerts and sporting events.  (*Id.*)

    **B.**    **The Covid-19 Pandemic and Its Impact on Live Nation**

8    Covid-19 is a deadly communicable disease caused by a recently discovered
9   virus known as SARS-CoV-2.  (Compl. ¶ 16.)   In early 2020, Covid-19 began its
10   spread throughout the world.  Observing the difficulty of containing this new
11   disease, on January 31, 2020 the World Health Organization (WHO) declared a
12   health emergency.  The United States followed suit on February 3, 2020.  By
13   March 2020, the Covid-19 outbreak was a global pandemic. (*Id.* ¶ 17.)

14   Beginning in March 2020, Live Nation began receiving reports of suspected
15   and confirmed cases of Covid-19 at its domestic properties.  (Compl. ¶ 28.)  Live
16   Nation is currently aware of more than 62 employees testing positive for Covid-19
17   at approximately 35 of its insured locations in the United States, nearly all in the
18   spring or summer of 2020.  (*Id.* ¶ 59.)  Of course, there were many other people
19   who had Covid-19 at the insured locations during the relevant time periods.  (*Id.*
20   ¶ 60.)  During 2020, the CDC estimated that infection rates for Covid-19 likely
21   were at least ten times higher than reported, meaning that Covid-19 was
22   widespread, particularly in California where the largest number of Live Nation's
23   properties are located.  (*Id.*)  Given the prevalence of Covid-19 and the fact that it
24   can be completely asymptomatic, it is a near certainty that many other employees,
25   as well as customers or others visiting Live Nation's insured locations, tested
26   positive for Covid-19 or had an unconfirmed case of Covid-19 while visiting an
27   insured location, unbeknownst to Live Nation.  (*Id.* ¶ 62.)  All of Live Nation's
28

1    venues were forced to close for some period of time, and many remained entirely

2    closed for all of 2020 and beyond.  (*Id.* ¶¶ 28–29.)

3        **C.**    **Live Nation's Purchase of FM's Global Advantage® Policy**

4           To protect its business, Live Nation purchased from FM an all-risks property

5    insurance policy with a term of June 1, 2019 through June 1, 2020—the so-called

6    "FM Global Advantage® Policy."  (Compl. ¶ 38.)  The FM Global Advantage®

7    Policy is a premier form of property coverage that, according to the form, not only

8    provides "All-Risks" property and business interruption coverage, but also

9    includes a variety of even further expansive "policy enhancements" added by FM

10   to the Global Advantage® Policy in 2016.  (*Id.* ¶ 43.)  According to FM's website,

11   these enhancements protect "against loss of income following a disaster, wherever

12   you operate, or however indirect your connection to the loss."  (*Id.*)

13          The FM Global Advantage® Policy insures Live Nation "against ALL

14   RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded"

15   and, most important here, ***specifically designates "communicable disease" as a***

16   ***covered peril***.  (Compl. ¶¶ 41, 45.)  Although communicable disease coverage was

17   optional for an additional premium, Live Nation chose to include communicable

18   disease coverage because of the significant threat that communicable disease

19   outbreaks pose to live entertainment businesses like Live Nation's, a threat that can

20   become existential.  (*Id.* ¶ 46.)

21          In addition to the Policy's broad "All-Risks" Property Damage Coverage,

22   the Policy has a separate section for "Time Element" coverage.  (Compl. ¶ 73.)  In

23   general, "time element" coverage is a form of coverage for loss resulting from the

24   inability to put property to its normal use, and typically includes coverage for lost

25   earnings/profits and the insured's extra expense to continue its business during the

26   period of loss, as Live Nation's coverage does here.  (*Id.*)  Live Nation purchased

27   FM's premier "Time Element Select™" option, which, according to FM, provides

28

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
4

1   "unmatched coverage." (*Id.* ¶ 74[1].)  As marketed by FM, "No one can predict the

2   future, and with our business interruption insurance coverage, you don't have

3   to." (*Id.*)  Per the terms of the Time Element Select™ coverage: "This Policy

4   insures TIME ELEMENT loss, as provided in the TIME ELEMENT

5   COVERAGES directly resulting from physical loss or damage of the type

6   insured." (*Id.* ¶ 75.)

7          Unlike the vast majority of property insurance policies—which do not

8   affirmatively cover communicable disease and contain a standard virus

9   exclusion—the FM Global Advantage® Policy does not contain the standard virus

10  exclusion.  Indeed, the policy's Property Damage Coverage includes, in addition

11  to, and not in lieu of, other coverages in the policy, a coverage grant entitled

12  "Communicable Disease Response." (Compl. ¶ 53.)  In relevant part, and in

13  accordance with that coverage's express terms, to the extent Live Nation's

14  properties are impacted by "the actual not suspected presence of communicable

15  disease," FM is obligated to pay for the "cleanup, removal and disposal of …

16  communicable disease from insured property." (*Id.*)  In other words, FM is

17  obligated to pay for the physical, tangible effects of communicable diseases on

18  insured property through remediation to "remov[e]", "dispos[e] of", and "cleanup"

19  the communicable disease physically present at and on Live Nation's property.

20  (*Id.* ¶¶ 53–54.)  The Communicable Disease Response coverage also expressly

21  states that it excludes coverage for "loss or damage" directly or indirectly caused

22  by terrorism.  (ECF No. 15-3 at 32–33.)  The policy's Interruption by

23  Communicable Disease coverage similarly states: "This Policy does not insure loss

24  or damage caused by or resulting from terrorism."  (ECF No. 15-4 at 10–11.)

25

26

27

28  [1] Citing https://www.fmglobal.com/products-and-services/products/business-interruption-coverage.

1

### D.     Live Nation's Coverage Claim

2       Live Nation timely submitted its proof of loss to FM in November 2020.

3   (Compl. ¶ 98.)  Despite having told its regulators that "the presence of and spread

4   of communicable disease will be considered direct physical damage," FM has to

5   date failed to acknowledge coverage for Live Nation's claim or to pay any of the

6   coverage it owes to Live Nation.  (*Id.* ¶ 101.)  Instead, based on positions FM has

7   taken here and in other litigation with its other insureds, it appears FM has decided

8   to use case law interpreting different insurance policies—policies *without*

9   communicable disease coverage—to justify denials of all or almost all coverage to

10   every insured that submits a Covid-19 related claim, including for insureds that

11   specifically purchased communicable disease coverage.  (*Id.* ¶¶ 102–106.)

12       Accordingly, Live Nation brought the instant suit to confirm and enforce its

13   rights to coverage under the FM Global Advantage® Policy.  FM now moves for

14   judgment on the pleadings, asserting that the Court does not even need to consider

15   the communicable disease coverage in FM's policy in order to decide that judicial

16   decisions interpreting different policies without communicable disease coverage

17   foreclose Live Nation's coverage claims.  (ECF Nos. 15, 15-1.)  FM also asserts

18   that the policy's "contamination" and "loss of market or loss of use" exclusions

19   separately bar coverage for Live Nation's losses.  One court has already denied FM

20   judgment on the pleadings based on these same exclusion arguments.  *Thor*

21   *Equities, LLC v. Factory Mut. Ins. Co.*, No. 20 CIV. 3380 (AT), 2021 WL

22   1226983, at *6 (S.D.N.Y. Mar. 31, 2021).  Another court appears to have denied a

23   similar motion by FM without even needing to directly address FM's exclusion

24   theory, finding that the policy is plainly broader than FM was contending.

25   (Plaintiff's Request for Judicial Notice ("RJN"), Exhibit B at 37–38.)

26

27

28

1  **III.  ARGUMENT**

2      **A.  Principles of Insurance Contract Interpretation**

3      "Interpretation of an insurance policy is a question of law and follows the

4  general rules of contract interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal.

5  4th 635, 647 (2003) (citing *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 18

6  (1995)). "'The fundamental rules of contract interpretation are based on the

7  premise that the interpretation of a contract must give effect to the 'mutual

8  intention' of the parties.'" *Id.* "'Such intent is to be inferred, if possible, solely

9  from the written provisions of the contract. ([Calif. Civil Code] § 1639).'" *Id.* "'A

10  policy provision will be considered ambiguous when it is capable of two or more

11  constructions, both of which are reasonable. [Citation.] But language in a contract

12  must be interpreted as a whole, and in the circumstances of the case, and cannot be

13  found to be ambiguous in the abstract.'" *Id.* at 648 (quoting *Waller*, 11 Cal. 4th at

14  18).

15      "[I]nsurance coverage is 'interpreted broadly so as to afford the greatest

16  possible protection to the insured, [whereas] ... exclusionary clauses are interpreted

17  narrowly against the insurer.'" *MacKinnon*, 31 Cal. 4th at 648 (quoting *White v.*

18  *Western Title Ins. Co.*, 40 Cal. 3d 870, 881 (1985)).

19      "Coverage language in an all-risk or open peril policy is *quite broad*,

20  generally insuring against all losses not expressly excluded." *The Villa Los*

21  *Alamos Homeowners Assn. v. State Farm Gen. Ins. Co.*, 198 Cal. App. 4th 522,

22  534 (2011) (citing *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470–71

23  (2004)) (emphasis in original).  "[I]n an action upon an all-risks policy ... (unlike a

24  specific peril policy), the insured does not have to prove that the peril proximately

25  causing his loss was covered by the policy. This is because the policy covers *all*

26  *risks* save for those risks specifically excluded by the policy. The insurer, though,

27  since it is denying liability upon the policy, must prove the policy's noncoverage

28  of the insured's loss —that is, that the insured's loss was proximately caused by a

peril specifically excluded from the coverage of the policy." *Vardanyan v. AMCO Ins. Co.*, 243 Cal. App. 4th 779, 796–97 (2015) (quoting *Strubble v. United Servs. Auto. Assn.*, 35 Cal. App. 3d 498, 504 (1973)) (alteration and emphasis in original).

In other words, under all-risks policies, "once the insured establishes basic coverage, the insurer bears the burden of proving the loss was caused by an excluded peril." *Vardanyan*, 243 Cal. App. 4th at 797 (quoting CACI Model Jury Instruction No. 2306); *see also Travelers Cas. & Sur. Co. v. Superior Court*, 63 Cal. App. 4th 1440, 1454–1455 (1998) (explaining that the *Strubble* court held that an insured who makes a claim under an all-risks policy "has no burden of proof" because "there is a presumption of coverage, which the insurer has the burden to rebut"). The same principles of course apply to coverage extensions. The *Strubble* court, for example, examined an "all-risks" policy that extended its coverage to earthquakes, whereas that peril would not typically be covered, even under an "all risks" policy. *Strubble*, 35 Cal. App. 3d at 502, 504. The policy also had an earth movement exclusion. *Id.* The burden of refuting the covered peril still fell squarely on the insurer. *Id.* at 504–505.

## B.   FM's Policy Recognizes Communicable Disease As a Covered Peril That Causes Physical Damage

The policy Live Nation purchased from FM is an all-risks policy that, on top of that, expressly covers communicable disease as one of those insured risks. (Policy, ECF No. 15-3 at 9, 32–33; ECF No. 15-4 at 10–11.) FM admits that Covid-19 is a communicable disease, (Answer, ECF No. 12 at ¶ 16), and admits that if communicable disease is classified as physical loss or damage under the policy, the additional policy provisions in Live Nation's Complaint are triggered. (ECF No. 15-1 at 11 ("Accordingly, unless Live Nation can demonstrate the required 'physical loss or damage,' these coverages are inapplicable to its claimed losses.").)

1   Nevertheless, FM assures the Court that it can somehow grant FM judgment
2   on the pleadings regarding the scope of Live Nation's coverage claim without
3   considering the scope of communicable disease coverage in FM's policy, and
4   instead that the Court somehow needs only to look to the policy's contamination
5   exclusion and judicial decisions interpreting policies *without communicable*
6   *disease coverage* to decide that Live Nation's coverage claims fail.  FM's
7   transparent attempt to confuse the issues should be rejected.

8               1.     *The Terms of the FM Global Advantage® Policy Demonstrate*
9                      *that Communicable Disease is a Covered Peril that Causes*
10                     *Physical Damage*

11          The policy Live Nation bought from FM is an all-risks policy that
12  specifically insures against the peril "communicable disease."  Thus, Live Nation's
13  communicable disease losses are covered unless expressly excluded.  *See, e.g.*,
14  *Vardanyan*, 243 Cal. App. 4th at 797 (under all-risks policy, "once the insured
15  establishes basic coverage, the insurer bears the burden of proving the loss was
16  caused by an excluded peril."); *see also The Villa Los Alamos Homeowners Assn.*,
17  198 Cal. App. 4th at 534 (when interpreting all-risks policy, "we broadly interpret
18  coverage language to give insureds the greatest possible protection, while narrowly
19  interpreting exclusionary clauses against the insurer.") (citing *MacKinnon*, 31 Cal.
20  4th at 648).  This includes not just the losses compensable under specific
21  "Communicable Disease Response" and "Interruption by Communicable Disease"
22  provisions, but the additional coverages that are triggered once Live Nation
23  experiences a covered loss.  For example, the policy includes "Extra Expense"
24  coverage, which covers the extra expense to temporarily continue the operation of
25  Live Nation's business as nearly normal as practicable after its business was
26  interrupted by communicable disease.  (ECF No. 15-3 at 53–54.)

27

28

1    FM argues that Live Nation's losses are excluded because the presence of

2    communicable diseases like Covid-19 does not constitute "physical loss or

3    damage" under the terms of the policy.  FM is wrong.

4    The FM Global Advantage® Policy Live Nation purchased covers the

5    presence of communicable disease as physical damage to property, as evidenced

6    by the plain meaning of the policy language.  (Compl. ¶¶ 54, 58.)  Communicable

7    diseases (including Covid-19) spread from one person to another not through

8    magic, but through physical agents capable of transmitting the disease (*e.g.*,

9    respiratory droplets containing a virus).  (*Id.* ¶¶ 54–58.)  The agents are often

10   small—even microscopic—but are nonetheless real, physical, and tangible, and

11   exist on surfaces and in the air.  (*Id.*)  Because all disease-causing agents are in

12   some sense "alive," they lose their ability to transmit disease to humans after a

13   certain amount of time passes or after being treated with certain chemicals, but that

14   does not make the agents any less physical or tangible.  (*Id.*)  The policy's

15   Communicable Disease Response provision recognizes the presence of

16   communicable disease on property and in the air as damage, covering the "cleanup,

17   removal and disposal of the actual not suspected presence of communicable

18   diseases from insured property."  (Policy, ECF No. 15-3 at 33.)  And the policy

19   *expressly recognizes* that disease-causing agents cause *physical damage* to

20   property.  (*Id.* at 24 ("only *physical damage caused by such contamination* may be

21   insured" (emphasis added)); ECF No. 15-4 at 24 (defining "contamination" as "any

22   condition of property due to the actual [] presence of . . . [a] disease causing or

23   illness causing agent").)

24   FM's argument that communicable disease does not cause physical loss or

25   damage is entirely based on inapplicable case law and avoids any analysis of its

26   actual policy language.  The Court should ignore FM's invitation to err and instead

27   focus on the actual policy FM sold to Live Nation, whose provisions cannot be

28   harmonized unless the presence of communicable disease constitutes physical

1    damage. *See, e.g.*, *S. Dental Birmingham LLC v. Cincinnati Ins. Co.*, No. 2:20-

2    CV-681-AMM, 2021 WL 1217327, at *4–5 (N.D. Ala. Mar. 19, 2021) (denying

3    insurer's motion to dismiss and rejecting physical damage case law cited by insurer

4    because insurer failed to engage in analysis of the actual policy terms according to

5    state law).

6        Consider, as an illustration, the contamination exclusion at issue in FM's

7    motion. If communicable disease is not physical damage (as FM's motion

8    proposes), the plain meaning of the communicable disease coverage directly

9    conflicts with the plain meaning of the exclusion. The exclusion provides:

> This Policy excludes the following unless directly resulting from other
> physical damage not excluded by this Policy: 1) **contamination**, and
> any cost due to **contamination** including the inability to use or
> occupy property or any cost of making property safe or suitable for
> use or occupancy. If **contamination** due only to the actual not
> suspected presence of **contaminant(s)** directly results from other
> physical damage not excluded by this Policy, then only physical
> damage caused by such **contamination** may be insured.

16   (ECF No. 15-3 at 24.) "Contamination," in turn, is defined as "any condition of

17   property due to the actual or suspected presence of any foreign substance,

18   impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic

19   organism, *bacteria, virus, disease causing or illness causing agent*, fungus, mold

20   or mildew." (ECF No. 15-4 at 24 (emphasis added).) The policy separately

21   defines communicable disease as disease "transmissible from human to human by

22   direct or indirect contact with an affected individual or the individual's

23   discharges." (*Id.*) In other words, the policy defines disease-causing agents as

24   excluded contamination while simultaneously providing coverage for

25   communicable disease transmitted from person to person, when it is *scientifically*

26   *impossible* for *any communicable disease* to spread from one person to another

27   without a disease-causing agent. FM's proffered policy interpretation causes these

28   provisions to directly conflict.

1    If communicable disease is physical damage, however, the two policy

2    provisions harmonize seamlessly.  This is because the contamination exclusion has

3    an express exception for covered physical damage, with physical damage

4    remaining covered despite the contamination exclusion: "If contamination due only

5    to the actual not suspected presence of contaminant(s) directly results from other

6    physical damage not excluded by this Policy, then only physical damage caused by

7    such contamination may be insured."  (ECF No. 15-3 at 24.)  Because the presence

8    of communicable disease is physical damage covered under the policy,

9    communicable disease satisfies this physical damage exception to the

10   contamination exclusion.  FM's motion asserts that there is nothing unreasonable

11   about an insurer generally excluding viral contamination while allowing for an

12   exception for covered communicable disease. (ECF No. 15-1 at 25.)  But what FM

13   hopes the Court will ignore is how that exception is *actually* articulated in the

14   language of the exclusion, which says that the exception is for "other *physical*

15   *damage* not excluded"—confirming that communicable disease is physical

16   damage.  (*See* ECF No. 15-3 at 24.)

17   At the very worst for Live Nation, the policy is ambiguous as to whether

18   communicable disease is covered as physical damage.  "A policy provision will be

19   considered ambiguous when it is capable of two or more constructions, both of

20   which are reasonable."  *MacKinnon*, 31 Cal. 4th at 648 (quoting *Waller*, 11 Cal.

21   4th at 18).  One reasonable construction of the policy is that communicable disease

22   is covered as physical damage; indeed, as discussed further below, that is what FM

23   told its regulators.  And even if FM's proposed narrower interpretation were *also*

24   *reasonable*, that is insufficient, as a matter of law, for FM to prevail on its motion.

25   If a policy provision is subject to two or more constructions that are reasonable, the

26   ambiguity *must* be resolved in favor of the insured, and in favor of coverage.

27   *E.M.M.I. Inc.*, 32 Cal. 4th at 470–71.  This rule applies with particular force where

28   the insurer is arguing for a narrower interpretation of a coverage provision, since

insuring provisions *must* be read broadly and language limiting coverage must be read narrowly. *Id.*; *see also The Villa Los Alamos Homeowners Assn.*, 198 Cal. App. 4th at 534 (when interpreting all-risks policy, courts "broadly interpret coverage language to give insureds the greatest possible protection, while narrowly interpreting exclusionary clauses against the insurer.") (citing *MacKinnon*, 31 Cal. 4th at 648).

2.    *FM Told Insurance Regulators that It Intended Communicable Disease to be Covered as Physical Damage*

Notably, FM itself told state insurance regulators that under the property insurance policy it sells, the presence of communicable disease is physical damage. In 2016, when FM updated the prior version of its Communicable Disease Response endorsement into a newer version—essentially identical to the version in the FM policy that Live Nation purchased[2]—FM submitted a redline of the changes to New York State's insurance regulators, together with an explanation of the impact of the redlined changes.  (RJN, Exhibit A.)  As seen on the redline, the prior version of the Communicable Disease Response coverage *expressly stated* that the presence of communicable disease was "physical damage" under the policy, and that cleaning costs were "repair" costs under the policy: "For the

---

[2] Two phrases in the endorsement submitted to New York State vary slightly from the endorsement in Live Nation's policy, but the meaning of the phrases is the same.  The first sentence in Live Nation's endorsement states "If a location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such location is limited, restricted or prohibited by", whereas the first sentence in the endorsement provided to New York State states "If access to a location owned, leased or rented by the Insured is limited, restricted or prohibited by".  Next, Live Nation's endorsement states that "this Policy covers the reasonable and necessary costs incurred by the Insured at such location with the actual not suspected presence of communicable disease for the" whereas the endorsement submitted to New York states "this Policy covers the reasonable and necessary costs incurred by the Insured at such locations for the".  Otherwise, the endorsements are identical.

purpose of this Additional Coverage, the presence of and spread of communicable disease will be considered direct physical damage and the expenses listed above will be considered expenses to repair such damage."[3]  (RJN, Exhibit A at 31.)

In other words, the prior version of the endorsement expressly told insureds that if they decided to purchase optional communicable disease coverage, the presence of communicable disease would qualify as physical damage.  When FM removed this language from the Communicable Disease Response coverage page, it told regulators that the change *did not effect any material change in coverage*. (RJN, Exhibit A at 17 ("The changes are grammatical and editorial to clarify intent. *There is no material change in coverage*.") (emphasis added).)  Indeed, to avoid any doubt, FM further explained to regulators that "[t]his endorsement was previously approved in filing FMIC-2011-13 as Communicable Disease Cleanup, Removal and Disposal Endorsement. The replaced Endorsement was previously available to insureds with healthcare occupancies only. Grammatical and editorial changes have been made to remove the healthcare facility terms because this coverage is now offered as optional to all clients. The coverage also now allows for an officer of the Insured to trigger the coverage. This is an expansion in coverage." (RJN, Exhibit A at 25.)

Of course, re-classifying communicable disease from being covered *as physical damage* to being covered *despite not being physical damage* would have

---

[3] FM's motion uses an argument about no property needing to be "repaired" or "replaced" to support its desired conclusion that the presence of communicable disease does not qualify as physical damage under the policy.  (ECF No. 15-1 at 20 ("This shows that physical loss is the kind of loss that can be addressed through replacement, and physical damage is the kind of damage that can be addressed through repair. The presence of COVID-19 is neither. COVID-19 is consequently not physical loss or damage.").)  FM's own regulatory submissions readily defeat this disingenuous argument.  As FM itself explained, expenses to remove, dispose of, and clean up communicable disease "will be considered expenses *to repair such damage*."  (RJN, Exhibit A at 31 (emphasis added).)

1   been a material reduction in coverage (that never took place), as demonstrated by

2   FM's instant motion: if communicable disease is covered as physical damage

3   under the policy (which is the intent), it will satisfy the contamination exclusion's

4   physical damage exception and trigger multiple coverages that will apply to Live

5   Nation's Covid-19 losses; if communicable disease is not covered as physical

6   damage under the policy, the coverage is much more restricted.

7        FM's statements to regulators, made contemporaneously to the revisions in

8   the policy itself, are compelling evidence of FM's intended meaning for policy

9   language.  Under California law, extrinsic evidence such as drafting history is

10  admissible to interpret the parties' intentions, establish ambiguity, or clarify

11  ambiguity.  *See*, *e.g.*, *MacKinnon*, 31 Cal. 4th at 653 (explaining that "[t]he history

12  and purpose of the clause, while not determinative, may properly be used by courts

13  as an aid to discern the meaning of disputed policy language" and finding

14  significant that insurer produced no evidence that its proposed policy interpretation

15  had been "communicated to the purchasers of insurance or insurance regulators");

16  *Boxed Foods Co., LLC v. California Cap. Ins. Co.*, No. 20-CV-04571-CRB, 2020

17  WL 6271021, at *6 (N.D. Cal. Oct. 26, 2020), *as amended* (Oct. 27, 2020) ("Even

18  if a contract is unambiguous, California courts consider extrinsic evidence when

19  the evidence 'is relevant to prove a meaning to which the language of the

20  instrument is reasonably susceptible.'  Such consideration includes evaluating

21  evidence of the parties' intentions.") (quoting *Pac. Gas & Elec. Co. v. G. W.*

22  *Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37–38 (1968)); *Palacin v. Allstate*

23  *Ins. Co.*, 119 Cal. App. 4th 855, 862 (2004) ("When the relevant provisions of an

24  insurance policy are ambiguous, extrinsic evidence may be admitted to determine

25  the proper interpretation.").

26        Here, FM's statements to regulators about how FM itself intended coverage

27  to function under the policy are relevant to prove that FM intended to classify the

28  presence of communicable disease as physical damage when it sold the policy to

Live Nation.  And, the Court may take judicial notice of FM's regulatory submissions that are made publicly available by New York State's insurance regulators, and consider them in its determination.[4]  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (judicial notice appropriate for public records available from reliable sources on the Internet, including websites run by a government agency); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (courts "may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment").

        3.     *Case Law Holding that Covid-19 Does Not Cause Physical Damage Under Different Policies, Providing Different Coverage, is Irrelevant*

As FM concedes, insurance policies are contracts whose interpretation is based on the mutual intent of the parties as evidenced by the terms of the policy read as a whole.  *See* ECF No. 15-1 at 16–17; *see also MacKinnon*, 31 Cal. 4th at 647–48.  This means that parties to a contract can choose to include coverage in an insurance policy where that coverage would not generally be available and that the existence and scope of that additional coverage plainly evidences the intent of the parties as to the coverage being sought.  Here, there is no question that Live Nation specifically sought and obtained FM's unique, additional coverage for risks related to communicable disease.

---

[4] If it is the Court's preference, Live Nation can also amend to expressly allege the existence of this evidence (and likely more) that demonstrates that FM affirmatively intended communicable disease to qualify as physical damage under the policy at the time of contracting.  *Jackson v. CEVA Logistics*, No. 19-CV-07657-LHK, 2020 WL 6743915, at *3 (N.D. Cal. Nov. 17, 2020); Fed. R. Civ. P. 15(a)(2).  Here, justice is not served by allowing FM to tell its regulators one thing, and then to pretend before this Court that Live Nation is somehow being unreasonable or fantastical when it understood the policy to mean *the exact same thing* FM told regulators it means.

1        Despite this, FM dedicates the majority of its motion to discussing case law

2  interpreting different policies that do not provide communicable disease coverage,

3  with different exclusions, applied to different facts, often not including any

4  allegations of the presence of Covid-19 at insured locations.  Such decisions

5  provide no guidance about how the instant policy should be interpreted.  FM does

6  not get to sell uniquely broad coverage for an additional premium, and then when

7  faced with a claim for that broader coverage, try to lump itself in with the all the

8  others.  *See, e.g.*, *Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins. Co.*, No. 1:20

9  CV 1239, 2021 WL 168422, at *10 (N.D. Ohio Jan. 19, 2021) (concluding that

10  voluminous case law cited by insurer examining whether Covid-19 was physical

11  loss or damage under state law provided "little guidance in interpreting" the policy

12  at issue because, *inter alia*, the "distinct Policies used different language and were

13  applied to different facts.").  Indeed, *not a single one* of the *twelve* cases applying

14  California law to find that Covid-19 is not physical loss or damage that FM cites in

15  its motion analyzed whether communicable disease constitutes physical damage

16  under the policy *where the policy at issue expressly covers communicable disease*.[5]

17        To decide Live Nation's claims, the Court must examine the policy at issue,

18  not a body of case law discussing how background legal principles about physical

19  damage apply to insurance policies without communicable disease coverage.  To

20  date, only one court has considered these issues *under an FM policy providing*

21  *communicable disease coverage*, and that court **denied** FM's motion for judgment

22  on the pleadings.  (RJN, Exhibit B at 38 (concluding that the FM policy sold to

23

24

-------

25  [5] Although one case cited by FM refers to the *existence* of communicable disease

26  coverage in the policy at issue, the court expressly stated that it did not consider

27  such coverage for purposes of its decision.  *See Out W. Rest. Grp. Inc. v. Affiliated FM Ins. Co.*, No. 20-CV-06786-TSH, 2021 WL 1056627, at *6 (N.D. Cal. Mar.

28  19, 2021) ("this Order does not address any pending claims Plaintiffs may have with AFM regarding Communicable Disease coverage under the Policy").

1     Cinemark Theatres providing communicable disease coverage "is much broader

2     than" the policies examined in the purportedly analogous case law cited by FM.)

3                4.      *FM is Wrong to Suggest that its Communicable Disease*

4                      *Coverage is Freestanding and Isolated from the Rest of the*

5                      *Policy, or Subject to an Aggregate Sublimit*

6        Although not stated expressly, what FM's motion really appears to be

7     arguing is that the communicable disease coverage is an isolated, freestanding

8     coverage that does not fit with the rest of the policy, and thus Live Nation's

9     coverage is restricted to the policy's sublimit for the "Communicable Disease

10    Response" and "Interruption by Communicable Disease".  But this is not how "all

11    risks" insurance policies work, and certainly not how the FM policy works.  Where

12    coverage is extended to an additional peril, unless the policy expressly states

13    otherwise, that extension filters throughout the entire policy.  Here, communicable

14    disease was added as covered physical damage, and while the sublimit applies to

15    one component of that coverage, it does not limit the rest (nor does it say so).  FM

16    knows better, and has seen this type of stand-alone coverage argument repeatedly

17    rejected by courts, including in a case in this District.  *See, e.g.*, *Northrop*

18    *Grumman Corp. v. Factory Mut. Ins. Co.*, 805 F. Supp. 2d 945, 953 (C.D. Cal.

19    2011) (rejecting Defendant FM's identical argument that its policy's specific flood

20    sublimit applied to cap all of Northrop Grumman's coverage under FM's policy

21    following Hurricane Katrina, and concluding that once Northrop experienced a

22    covered loss from flood, additional coverages were triggered with separate limits);

23    *Hewlett-Packard Co. v. Factory Mut. Ins. Co.*, No. 04 CIV. 2791TPGDCF, 2007

24    WL 983990, at *3, *8 (S.D.N.Y. Mar. 30, 2007) (rejecting Defendant FM's same

25    argument that specific sublimit capped all coverage under policy).

26        The illogic of FM's position can be shown by considering the example of

27    auto insurance.  An auto policy covers physical damage to vehicles, and once

28    coverage is triggered, also provides coverage for towing the damaged car to the

1  mechanic and for a rental car while repairs are made.  If the insured adds optional

2  motorcycle coverage with a separately stated sublimit for direct damage to the

3  motorcycle, the policy insures the motorcycle up to the sublimit, and continues to

4  provide coverage for towing and a rental, *unless otherwise stated*.  In other words,

5  adding optional motorcycle coverage brings motorcycles under the policy as an

6  *additional* type of covered vehicle when they would not have been covered before,

7  just as the addition of optional communicable disease coverage brings an

8  additional category of peril within the coverage provided by FM's policy.

9        If FM wanted to draft the policy so that communicable disease coverage was

10  freestanding and did not trigger other coverage under the policy, it could easily

11  have done so.  It did so with regards to the policy's Off Premises Data Services

12  Time Element Coverage, which expressly states that "Coverage provided in this

13  Extension is excluded from coverage elsewhere in this Policy."  (ECF 15-4 at 2.)

14  FM could easily have included *this exact sentence* in the Communicable Disease

15  provisions if that is how it wanted the provisions to work, but it did not.  Or FM

16  could simply have stated that communicable disease would be covered as "non-

17  physical" damage so that insureds would not expect the coverage to trigger certain

18  other coverages, as it did with the "Computer Systems *Non Physical Damage*"

19  coverage.  (ECF No. 15-3 at 59 (emphasis added).)

20        But FM chose not to draft its policy to include any of the above, or any of

21  the dozens of other ways it could have structured the policy to clearly state that

22  communicable disease coverage does not trigger additional coverages, and FM

23  must live with the policy it drafted, not the policy it now wishes it had drafted.[6] *See*

24

25  [6] The insurance industry has long been aware of the risks posed by pandemics and

26  the attendant implications for significant liability under business interruption
    coverages, and many chose to exclude those risks.  *See, e.g.*, *Choctaw Nation of*

27  *Oklahoma v. Lexington Ins. Co.*, No. CV-20-42, 2021 WL 714032, at *10 (D.

28  Okla. Jan. 27, 2021) ("[I]n 2008, Lloyd's published Pandemic: Potential Insurance

*E.M.M.I. Inc.*, 32 Cal. 4th at 470–71 ("the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language. The exclusionary clause must be *conspicuous, plain and clear*.") (internal quotation marks and citations omitted; emphasis in original); *see also Northrop Grumman Corp.*, 805 F. Supp. 2d at 952 ("the court declines to read language into the Flood Sublimit that was available and sophisticated parties chose not to employ.").

Finally, any given sublimit also only applies to the particular component of the policy that is specified, not everything.  Both the policy language and structure show that this is how the policy features work.  For example, consider the FM policy's claims preparation costs coverage (*i.e.*, coverage for the insured's costs for its employees to gather the information necessary to submit a claim to FM).  (ECF No. 15-3 at 32.)  The sublimit for claims preparation costs is $5 million, (*id.* at 12), several times higher than the sublimit provided for some other coverages, including the $1 million sublimit for Communicable Disease Response, (*id.*).  The claims preparation costs coverage states that "[t]his Additional Coverage is subject to the deductible that applies to the loss" but makes no mention of being subject to the sublimit for other coverages. (*Id.* at 32.)  There is no physical loss or damage requirement specifically stated in the claims preparation costs coverage.  (*Id.*)  Based on these provisions, the reasonable expectation of the insured is that the claims preparation costs coverage exists in addition to and separate from coverage for the loss—*i.e.*, the insured's communicable disease response expenses are covered up to the $1 million sublimit, and that coverage in turn triggers the separate, additional claims preparation costs coverage up to the separate $5 million sublimit.

---

Impacts, where it stated business interruption coverage needed to be carefully drafted by carriers because a pandemic is inevitable.")  Instead of excluding this risk, FM affirmatively chose to insure it.

**C.**     **No Exclusions Bar Coverage for Live Nation's Communicable Disease Losses**

FM next asserts that Live Nation is not entitled to coverage because the policy contains an exclusion for "contamination," and viruses and disease-causing agents are listed as contaminants.  (ECF No. 15-1 at 23–25.)  FM also contends that because communicable disease does not constitute physical damage, Live Nation's losses are excluded by a "loss of market or loss of use" exclusion.  (*Id.* at 26.)

When an insurer attempts to avoid coverage through an exclusion, the burden is "on the insurer to establish that the claim is specifically excluded." *MacKinnon*, 31 Cal. 4th at 648.  The "burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language," *id.*, and if there is more than one reasonable interpretation of an exclusion, "the exclusion must be interpreted in favor of coverage."  *Id.* at 656.  Here, FM argues that despite the fact that the policy covers communicable disease and that Covid-19 is a communicable disease, the contamination exclusion nonetheless applies because although the policy doesn't say so plainly or clearly, the policy's communicable disease coverage *is actually a limited unstated exception to* the broadly applicable contamination exclusion.  (ECF No. 15-1 at 12.)  Thus far, two courts have considered requests by FM to dismiss Covid-19 coverage claims based on the FM "contamination" and "loss of market or loss of use" exclusions at issue in this motion; both denied FM's motions.  (RJN, Exhibit B); *Thor Equities, LLC*, 2021 WL 1226983, at *6.

FM's tortured reading of the policy should not be credited.  The policy nowhere states "in clear and unmistakable language" that communicable disease coverage is a limited exception to the contamination exclusion.  And FM's proposed interpretation directly conflicts with California law by inverting the applicable interpretation principles, as FM's proposed interpretation reads the

communicable disease coverage narrowly and the contamination exclusion broadly.  *See, e.g., The Villa Los Alamos Homeowners Assn.*, 198 Cal. App. 4th at 534 (explaining that when interpreting an all-risks policy, "we broadly interpret coverage language to give insureds the greatest possible protection, while narrowly interpreting exclusionary clauses against the insurer.") (citing *MacKinnon*, 31 Cal. 4th at 648); *see also MacKinnon*, 31 Cal. 4th at 648 (requiring insurers "to phrase exceptions and exclusions in clear and unmistakable language").

Moreover, as explained above, FM's proffered policy construction causes the contamination exclusion to directly conflict with the plain meaning of the communicable disease coverage.  Communicable disease causing agents cannot be simultaneously covered and excluded.  Thus, FM's interpretation of the exclusion is not only an improperly broad reading of an exclusion, but also fails to read the policy as a whole.  *See MacKinnon*, 31 Cal. 4th at 648 ("language in a contract must be interpreted as a whole . . . . Moreover, insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] ... exclusionary clauses are interpreted narrowly against the insurer.") (internal quotation marks and citation omitted).

A closer look at other policy provisions shows further conflicts with FM's interpretation, and again confirms it cannot be correct.  Consider the claims preparation costs coverage discussed above, which is a prototypical example of a universal additional coverage provision that applies to every claim (like the free towing in auto coverage).  If the policyholder has to spend money completing its claim, FM will pay for it, up to a sublimit.  However, if the Court were to accept FM's reading of the contamination exclusion, Live Nation would receive no claims preparation costs protection for its communicable disease coverage claims.  That is because the contamination exclusion would apply broadly to exclude "any cost due to" the virus/disease-causing agent that causes communicable disease.  (*See* ECF No. 15-3 at 24.)  Are claims preparation costs then *another* unstated exception, like

1   communicable disease?  How is the policyholder supposed to know any of this?

2   That is the problem with reading exclusions broadly and out of concert with the

3   rest of the policy: the rest of the policy quickly starts losing all common sense.

4          FM's proposed interpretation of the exclusion has other flaws as well.  By its

5   own terms, for example, the exclusion applies only to "costs" and not losses.  *See*

6   *Thor Equities, LLC v. Factory Mut. Ins. Co.*, 2021 WL 1226983, at *4 (finding the

7   scope of FM's contamination exclusion ambiguous because "[f]or instance, the

8   Policy distinguishes between 'cost' and 'loss' elsewhere, but no such distinction is

9   present here. See, e.g., Policy at 31–34, 45, 56–66. Moreover, the plain meaning of

10  cost—'the amount paid or charged for something'—could plausibly refer to

11  affirmative outlays, like paying for temporary use of other property.").

12         As explained earlier, all of FM's gymnastics to try to reconcile conflicting

13  parts of the policy under its reading of the communicable disease coverage

14  immediately become unnecessary when it is simply admitted and understood that,

15  under this policy, communicable disease has been deemed to constitute physical

16  damage.  Communicable disease then fits in the physical damage exception to the

17  contamination exclusion, and everything again makes sense.  In short, not only is

18  that a reasonable interpretation of the coverage and exclusion—all that is required

19  under California law[7]—but it also happens to be by far the *most* reasonable

20  interpretation.  And, of course, none of that is surprising, since Live Nation's

21  reading of the policy is what FM *actually* intended when it wrote and sold the

22  policy.

23         As to FM's arguments about the "loss of market or loss of use" exclusion,

24  FM admits that the exclusion does not apply to Live Nation's claims if

25  communicable disease constitutes physical damage under the policy.  (*See* ECF

26  No. 15-1 at 11.)  Indeed, the exclusion *could not apply* when loss of use results

27

28

[7] *Cf. Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758, 763 (2001).

1    from physical damage without completely gutting the policy, which provides a

2    variety of business interruption coverages for loss of use *resulting from* physical

3    loss or damage.  (*See, e.g.*, ECF No. 15-3 at 54 (proving leasehold interest

4    coverage for the rent payable on a property that is "partially untenantable or

5    unusable . . . ."), ECF No. 15-4 at 3–7, 10–11 (providing coverage for loss of use

6    resulting from civil or military authority, an obstruction of ingress or egress, and

7    the interruption of certain services or by communicable disease).)  Reading the

8    "loss of market or loss of use" exclusion to apply where the loss of use results from

9    physical damage would render the policy's multiple business interruption

10   coverages illusory.  *See Henderson Rd. Rest. Sys., Inc.*, 2021 WL 168422, at *16

11   (concluding that policy's loss of use exclusion did not bar Covid-19 losses because

12   finding otherwise would "vitiate the Loss of Business Income coverage").

13       **D.**   **Live Nation's Losses Were Caused by Communicable Disease**

14       Finally, FM argues that it does not owe Live Nation any coverage "because

15   Live Nation's claimed losses were caused not by physical loss or damage, but by

16   government orders," and because, in order to obtain the FM policy's government

17   orders coverage, the government orders must be a "direct result of physical damage

18   of the type insured at the insured location or within five statute miles."  (ECF No.

19   15-1 at 26–29.)  This argument fails for two reasons.  First, the Complaint makes

20   plain that Live Nation alleges actual physical damage and the actual presence of

21   communicable disease on covered properties.  Live Nation is not saying that the

22   government orders themselves were the physical damage or caused the physical

23   damage that triggers coverage.  On a motion for judgment on the pleadings, FM is

24   not entitled to reframe Live Nation's allegations.  Second, since communicable

25   disease is physical loss or damage under the FM policy, the government orders

26   were plainly the result of physical loss or damage.  Indeed, FM concedes that at

27   least one relevant government order even expressly states that it was issued as a

28   direct result of physical damage to property caused by communicable disease.

(*Id.*)  Thus, this argument really just follows the same logic as all of FM's arguments, requiring the false proposition that communicable disease is not physical damage even under this policy where it has been added as a covered peril.

## IV.  CONCLUSION

For the reasons stated above, Defendant's Motion for Judgment on the Pleadings should be denied in its entirety.


Dated:  May 14, 2021                    HALPERN MAY YBARRA GELBERG LLP
                                        Marc D. Halpern
                                        Leslie A. Pereira
                                        Thomas Rubinsky


                                        By:  /s/ Marc D. Halpern
                                            Marc D. Halpern
                                        Attorneys for Plaintiff
                                        Live Nation Entertainment, Inc.